IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Jennifer Gutierrez, *et al.*, | : | |
| | : | Case No. 1:20-cv-354 |
| Plaintiffs, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | **Order Granting in Part and Denying** |
| Selection Management Systems, Inc., *et al.*, | : | **in Part Plaintiffs' Motion for Partial** |
| | : | **Summary Judgment and Granting in** |
| | : | **Part and Denying in Part Defendants'** |
| Defendants. | : | **Motion for Summary Judgment** |
| | : | |

This contract-dispute action is before the Court on Plaintiffs' Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. (Docs. 52, 53.)[1] For the reasons that follow, both motions will be **GRANTED IN PART and DENIED IN PART**.

I.  BACKGROUND

A.  Facts

Defendant Selection Management Systems, Inc. ("SMS") is an Ohio for-profit corporation that performs civil and criminal background checks, and other similar functions, for a range of clients. (Doc. 53-1 at PageID 3609–10; Doc. 56-1 at PageID 3652.) Defendant John Hart is the majority shareholder of SMS, as well as SMS's chairman and chief executive officer. (Doc. 53-1 at PageID 3609; Doc. 56-1 at PageID 3652.) In 1997, Charles Bailey ("Mr. Bailey") joined SMS as a 10% shareholder and executed a Close Corporation Agreement (the "CCA") with Hart. (Doc. 52-1 at PageID 3566; Doc. 57-1 at PageID 3678.)

In 2016, Mr. Bailey expressed to Hart his intention to retire at the end of the year, and the two negotiated for Mr. Bailey to assign his shares of SMS stock to SMS. (Doc. 53-1 at PageID

---

[1] Plaintiffs' Motion was initially filed as docket entry 51. In order to comply with Local Rule 5.1(c), Plaintiffs refiled their Motion as docket entry 53, which is the document upon which the Court relies throughout its Order. Further, the Court notes that Defendants' Motion was jointly filed by both Defendants.

3610; Doc. 56-1 at PageID 3652.) The negotiations culminated in Mr. Bailey and SMS, with the approval of Hart, executing an Assignment of Shares agreement (the "Assignment") on September 8, 2016. (Doc. 53-1 at PageID 3610–11; Doc. 56-1 at PageID 3652.) The Assignment provides that:

> Assignee shall pay Assignor, as consideration for the assignment of the Assigned Shares, $27,500 per quarter, in advance, for forty (40) calendar quarters (each a "Quarterly Payment"). Each Quarterly Payment shall be made on the first day of each calendar quarter beginning with the calendar quarter starting January 1, 2017, with the final payment due on October 1, 2026, unless the amount due hereunder has been accelerated pursuant to the terms of this Agreement. Each Quarterly Payment shall be paid by wire transfer of immediately available funds to an account designated by Assignor. In the event Assignor shall die before the payments are complete, all payments due after Assignor's death shall be made to Assignor's surviving spouse or trust until the final 40th scheduled payment has been completed.

(Doc. 1-1 at PageID 8.)

Tragically, Mr. Bailey and his wife, Rita Bailey ("Mrs. Bailey"), were involved in a fatal motorcycle accident in the summer of 2019, with Mr. Bailey passing away in June and Mrs. Bailey passing away shortly thereafter in July. (Doc. 52-1 at PageID 3574–75; Doc. 57-1 at PageID 3685–86.) Prior to their untimely deaths, in 2018 Mr. and Mrs. Bailey executed The Charles and Rita Bailey Living Trust (the "Bailey Living Trust"). (Gutierrez Dep., Doc. 45-3 at PageID 2684; Doc. 49-3.) Upon the deaths of Mr. and Mrs. Bailey, Plaintiffs Jennifer Gutierrez, Mr. Bailey's daughter, and Bree Alexander, Mr. Bailey's step-daughter, became co-trustees of the Bailey Living Trust. (Doc. 52-1 at PageID 3564–65; Doc. 57-1 at PageID 3677.)

Pursuant to the terms of the Assignment, SMS made 11 quarterly payments of $27,500 between 2017 and 2019. (Doc. 45-2 at PageID 2606–10; Doc. 53-1 at PageID 3611; Doc. 56-1 at PageID 3653.) The first 10 quarterly payments were made to Mr. Bailey, individually. (Doc. 53-1 at PageID 3611; Doc. 56-1 at PageID 3653.) The 11th quarterly payment, made in the third

quarter of 2019 and prior to Mrs. Bailey's death, was sent to Gutierrez as requested and made payable to the Bailey Living Trust. (Nelson Dep., Doc. 45-1 at PageID 2531–34; Doc. 53-1 at PageID 3612; Doc. 56-1 at PageID 3653.) On September 25, 2019, Defendants informed Gutierrez that no more payments pursuant to the Assignment would be forthcoming. (Doc. 53-1 at PageID 3612; Doc. 56-1 at PageID 3653.) Prior to ceasing the quarterly payments, SMS paid a total of $302,500 under the Assignment. (Doc. 52-1 at PageID 3575; Doc. 57-1 at PageID 3686.) Plaintiffs contend that, pursuant to the Assignment, the Bailey Living Trust is entitled to the remaining 29 quarterly payments totaling $797,500.

### B. Procedural Posture

Plaintiffs initiated this action in their capacity as the co-trustees of the Bailey Living Trust[2] on May 4, 2020, asserting six claims against Defendants. Count I alleges SMS breached the Assignment by ceasing the quarterly payments. Counts II and III are asserted only against Hart, alleging he personally guaranteed payments due under the Assignment and breached this guaranty and his fiduciary duty, respectively. And in Counts IV and V, Plaintiffs assert claims of unjust enrichment and conversion against both Defendants, respectively. Lastly, Count VI seeks a declaratory judgment regarding the parties' rights and obligations under the Assignment and CCA.

Plaintiffs and Defendants have filed cross-motions for summary judgment. (Docs. 52, 53.) Plaintiffs have moved for summary judgment on Counts I, II, and VI, and Defendants have moved for summary judgment on all claims. Defendants also request discovery sanctions for Plaintiffs' failure to preserve electronically stored information. Both motions are fully briefed and ripe for review.

---

[2] Plaintiffs are also the co-executors of Mr. Bailey's estate.

## II. STANDARD OF LAW

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

4

"The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 (relying on videotape evidence to refute a party's alleged facts); *Shreve*, 743 F.3d at 132–33.

### III. ANALYSIS

#### A. Discovery Sanctions

In moving for summary judgment, Defendants also seek discovery sanctions under Federal Rule of Civil Procedure 37(e) for Plaintiffs' failure to preserve electronically stored information ("ESI"). Specifically, Defendants request dismissal of this case via summary judgment. In the alternative, Defendants request Plaintiffs be precluded from introducing parol or extrinsic evidence, or the Court give a permissive inference in favor of Defendants at trial. Defendants also request attorneys' fees.

"As a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information, including ESI, when that party 'has notice that the evidence is relevant to litigation . . . or should have known that the evidence may be relevant to future litigation.'" *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (citation omitted). Rule 37(e) governs situations where "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If a court finds that prejudice has resulted due to such a failure, a court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1).

Alternatively, if a court finds the offending party "acted with the intent to deprive another party of the information's use in the litigation," a court may: "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2)(A)–(B). "Sanctions under Rule 37(e) are discretionary." *Faulkner v. Aero Fulfillment Servs.*, No. 1:19-cv-268, 2020 WL 3048177, at *5 (S.D. Ohio June 8, 2020).

The ESI at issue are the email accounts of Mr. and Mrs. Bailey. Alexander testified that in the fall of 2019, she cancelled Mr. and Mrs. Bailey's utilities, which included their Windstream telephone plan. (Alexander Dep., Doc. 45-7 at PageID 3178–79.) Plaintiffs attempted to access Mr. and Mrs. Bailey's email accounts after cancelling their telephone plan, but were informed by Windstream that once a telephone plan is cancelled all associated email accounts are deactivated and the emails are deleted. (Doc. 45-9 at PageID 3423–24.) Both Alexander and Gutierrez testified that prior to cancelation of the telephone plan, no efforts were made to preserve emails associated with Mr. and Mrs. Bailey's accounts. (Gutierrez Dep., Doc. 45-3 at PageID 2714; Alexander Dep., Doc. 45-7 at PageID 3180.) In opposing Defendants' Motion for Summary Judgment, Alexander and Gutierrez filed declarations[3] stating that they did

---

[3] Defendants ask the Court to strike Plaintiffs' declarations because the emails attached to the declarations were not produced during discovery. (*See* Porotsky Decl., Doc. 58.) The parties previously had a discovery dispute concerning, in part, ESI related to the Windstream email accounts, which resulted in the Court issuing an Order directing Plaintiffs to attempt to obtain access to the email accounts. (Doc. 22.) Thereafter, Defendants issued further written discovery requests, including a request to produce:

> all documents which discuss, refer, or relate to communications with Windstream (or other email providers relating to Mr. Bailey or his wife) involving the email accounts of Mr. Bailey and his wife. This includes but is not limited to all communications relating to the status of those email accounts and attempts to restore or access those accounts during the course of this litigation.

(Doc. 34-4 at PageID 645.) The Court finds that consideration of the declarations and attached emails is appropriate, as the emails were not improperly withheld. First, the emails did not relate to communications with Windstream or other email providers; they consist of one email chain between Alexander and Gutierrez, and one email from Rob Foster, Alexander's brother, to Alexander and Gutierrez. Second, the emails only contain cursory references to the Windstream email accounts.

not know they would lose access to Mr. and Mrs. Bailey's email accounts upon termination of their telephone plan, and that they did not know the email accounts might have had emails relevant to the Assignment. (Alexander Decl., Doc. 55-1 at PageID 3620; Gutierrez Decl., Doc. 55-2 at PageID 3628–29.)

The Court finds that any potential sanctions are unwarranted. Although Mr. and Mrs. Bailey's email accounts were deleted and no emails were preserved, Defendants have not sufficiently demonstrated that Plaintiffs "acted with the intent to deprive" them of use of the email accounts. Fed. R. Civ. P. 37(e)(2). Moreover, Plaintiffs' declarations undercut any such speculation, as they demonstrate Plaintiffs were unaware that cancellation of Mr. and Mrs. Bailey's telephone plan would simultaneously permanently delete their email addresses. (Alexander Decl., Doc. 55-1 at PageID 3620; Gutierrez Decl., Doc. 55-2 at PageID 3628–29.) The Court also finds that less severe sanctions are not appropriate under Rule 37(e)(1) as Defendants have not been prejudiced by loss of the emails. "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37, 2015 Advisory Comm. Note. Defendants argue the deleted accounts may have contained emails that are relevant to whether Mr. Bailey and Hart intended for the quarterly payments under the Assignment to cease after both Mr. and Mrs. Bailey were deceased. Yet, as explained *infra*, the clear and unambiguous language of the Assignment states that the quarterly payments "shall be made . . . until the final 40th scheduled payment has been completed" (Doc. 1-1 at PageID 8), and parol or extrinsic evidence is therefore inadmissible to contradict the Assignment's plain language. Accordingly, Defendants' request for discovery sanctions is **DENIED**.[4]

---

[4] Defendants also assert that discovery sanctions are warranted because Plaintiffs failed to produce a purported attachment to the Bailey Living Trust. The Bailey Living Trust refers to "property listed on the *Act of Transfer*

### B. Count I: Breach of the Assignment

Count I alleges SMS breached the Assignment by discontinuing the quarterly payments. To establish a breach of contract claim, the plaintiff must demonstrate (1) the existence of a contract, (2) the plaintiff performed under the contract, (3) the defendant breached the contract, and (4) loss or damages to the plaintiff. *Nnazor v. Cent State Univ.*, 79 N.E.3d 1278, 1282 (Ohio Ct. App. 2016). As an initial matter, there is no material dispute that Plaintiffs have established the first, second, and fourth elements. The Court thus turns its attention to whether SMS breached the Assignment.

Both Plaintiffs and SMS claim they are entitled to summary judgment on this claim based on the clear and unambiguous language of the Assignment. Plaintiffs assert the Assignment requires quarterly payments to be made until the final 40th payment is completed, while SMS contends that after Mr. Bailey's death, the quarterly payments ceased upon the death of Mrs. Bailey. Resolution of the parties' dispute presents an issue of contract interpretation. "The interpretation of written contract terms is a matter of law for initial determination by the trial court." *Anadarko E&P Co. LP v. Northwood Energy Corp.*, No. 2:12-cv-00938, 2015 WL 13748033, at *2 (S.D. Ohio July 24, 2015) (citing *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)). "It is a fundamental rule that a court is to construe a contract to ascertain and give effect to the intent of the contracting parties." *Mazzella Lifting Techs., Inc. v. Farmer*, No. 1:16 CV 395, 2017 WL 4883238, at *4 (N.D. Ohio Jan. 20, 2017). "When confronted with an issue of contract interpretation, the role of the court is to give effect to the intent of the parties to the agreement. The court examines the contract as a whole and presumes that the intent of the

---

documents and the *Personal Property Transfer and Assignment* document, attached to this agreement" (Doc. 49-3 at PageID 3464), and Defendants claim these documents were not produced. Because Defendants raise this argument for the first time in their reply brief, the Court declines to address it. *Books A Million, Inc. v. H & N Enter., Inc.*, 140 F. Supp. 2d 846, 859 (S.D. Ohio 2001) ("It is well settled, however, that a party may not raise an issue for the first time in a reply brief.").

parties is reflected in the language used in the agreement." *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm.*, 129 Ohio St. 3d 485, 954 N.E.2d 104, 109–10 (2011).

The relevant contractual provision provides that "[i]n the event Assignor shall die before the payments are complete, all payments due after Assignor's death shall be made to Assignor's surviving spouse or trust[5] until the final 40th scheduled payment has been completed." (Doc. 1-1 at PageID 8.) Upon review, the Court finds that this contractual language unambiguously provides that quarterly payments under the Assignment shall be made "until the final 40th scheduled payment has been completed." (*Id.*) The contractual language indicates the signatories expressly contemplated the death of Mr. Bailey, and that in such event, the quarterly payments shall continue and be made "to Assignor's surviving spouse or trust." (*Id.*) Further, the language reflects the signatories contemplated the death of Mrs. Bailey, upon which quarterly payments shall continue and be made to a "trust." (*Id.*) "When terms of a contract are clear and unambiguous, the contract's 'interpretation is a matter of law and there is no issue of fact to be determined.'" *Durick v. eBay, Inc.*, No. 05-MA-198, 2006 WL 2672795, at *2 (Ohio Ct. App. Sept. 11, 2006) (quoting *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Oh., Inc.*, 15 Ohio St. 3d 321, 474 N.E. 2d 271, 272 (1984)). In sum, the contractual language means what it says: quarterly payments shall continue, even in the event of Mr. and Mrs. Bailey's death, "until the final 40th scheduled payment has been completed." (Doc. 1-1 at PageID 8.)

SMS argues the right to payment under the Assignment terminated upon the death of

---

[5] The parties agree that the term "trust" encompasses the Bailey Living Trust. SMS contends that the Assignment incorporates by reference the Bailey Living Trust, and Plaintiffs assert the Bailey Living Trust is a third-party beneficiary of the Assignment. The Court, however, finds that use of the term "trust" is ambiguous, and therefore parol evidence is admissible to interpret this term. *Hague v. Kosicek*, 137 N.E.3d 530, 534 (Ohio Ct. App. 2019). Hart testified that prior to executing the Assignment, he and Mr. Bailey discussed Mr. Bailey creating a living trust. (Hart Dep., Doc. 33 at PageID 393–94.) Hart further testified that he "agreed to . . . [make payments to Mr. Bailey's] living trust," and this agreement was memorialized in the Assignment. (*Id.* at PageID 394.) Diana Nelson, SMS's chief financial officer, also testified that Mr. and Mrs. Bailey had planned to create a living trust. (Nelson Dep., Doc. 45-1 at PageID 2518–19.) In light of this evidence, the Court concludes that the term "trust" as used in the Assignment encompasses the Bailey Living Trust.

Mrs. Bailey, as the Assignment omits any reference to "successors, heirs or assigns." (Doc. 52 at PageID 3549.) By excluding this language, SMS contends the right to receive the quarterly payments was "personal" to Mr. and Mrs. Bailey. *See Joseph Bros. Co., LLC v. Dunn Bros., Ltd.*, 148 N.E.3d 1260, 1269–70 (Ohio 2019) (concluding that "exclusion of the grantee's successors and assigns appears to have been deliberate and reflects the parties' intention neither to bind, nor benefit, any successor [of the defendant]"). In support of this position, SMS relies on *Miller v. Cardinal Care Management, Inc.*, No. 107730, 2019 WL 3046127 (Ohio Ct. App. July 11, 2019). In *Miller*, the court considered whether an arbitration agreement signed by a deceased nursing home resident could be enforced against the resident's heirs. *Id*. at *4–6. The court held the arbitration agreement did not bind the resident's heirs, as the heirs did not sign the agreement and the agreement lacked any language making it binding upon the resident's heirs, beneficiaries, successors, or assigns. *Id*. at *6. This authority, however, is inapposite. As the Court has already concluded, the Assignment includes language demonstrating that the parties intended for the quarterly payments to continue until the final payment is completed. Moreover, this matter does not involve the rights or obligations of successors, heirs, or assigns, as the Assignment references a "trust," and Plaintiffs have initiated this lawsuit in their capacity as co-trustees of the Bailey Living Trust.

SMS also argues, in the alternative, that the Assignment is ambiguous as to whether the quarterly payments terminated upon the death of Mrs. Bailey, and parol evidence establishes that the parties did not intend for the payments to continue after Mrs. Bailey's death. The parol evidence rule provides that "absent fraud, mistake, or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." *Hague v.*

*Kosicek*, 137 N.E.3d 530, 534 (Ohio Ct. App. 2019) (quoting *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 734 N.E.2d 782, 788 (2000)).  If a term is ambiguous on its face, parol evidence is admissible to interpret the express language of the contract.  *Id*. (citing *Sherock v. Ohio Mun. League Joint Self Ins. Pool*, No. 2003-T-0022, 2004 WL 605105, at *4 (Ohio Ct. App. Mar. 29, 2004)).  Yet "when the terms of an agreement are clear and unambiguous, parol evidence cannot be considered in construing the terms."  *Id*. (citing *Currier v. Penn-Ohio Logistics*, 187 Ohio App. 3d 32, 931 N.E.2d 129, 142 (2010)).  Since the Court finds that the Assignment's terms concerning the duration of the quarterly payments are clear and unambiguous, consideration of parol evidence on this issue is improper.  "[I]f such an ambiguity is alleged, it must arise from the language of the contract itself and, therefore, courts will not admit parol testimony to construe an ambiguity forced into the contract to strain the apparent meaning of the language." *United States v. Ohio*, 787 F.3d 350, 354 (6th Cir. 2015) (quoting *Fireman's Fund Ins. Co. v. Mitchell-Peterson, Inc.*, 63 Ohio App. 3d 319, 578 N.E.2d 851, 856 (1989)).

Next, SMS contends its interpretation of the Assignment is supported by comments made by Hart and Mr. Bailey *after* execution of the Assignment, but the Court will not consider this evidence either.  The parol evidence rule is not applicable to communications occurring after a contract's execution.  *Kraft Elec. Contracting, Inc. v. Lori A. Daniels Irrevocable Trust*, 136 N.E.3d 951, 956 (Ohio Ct. App. 2019) (stating the parol evidence rule "has little, if any, application to communications *subsequent* to the written agreement") (emphasis in original). Nevertheless, a court cannot rely on extrinsic evidence to interpret a contractual provision that is unambiguous.  *See, e.g., Campbell v. 1 Spring, LLC*, No. 18AP-94, 2019 WL 852115, at *3 (Ohio Ct. App. Feb. 21, 2019) (citing *Drs. Kristal & Forche, D.D.S., Inc. v. Erkis*, No. 09AP-06, 2009 WL 3465916, at *4 (Ohio Ct. App. Oct. 27, 2009)) ("If the terms of the contract are clear

11

and precise, it is not ambiguous and the court may not refer to evidence outside of the contract to determine the meaning of those terms."); *Wiseman v. Wiseman*, No. 13CA0009-M, 2014 WL 1896482, at *2 (Ohio Ct. App. May 12, 2014) (citing *Dzeba v. Dzeba*, No. 16225, 1993 WL 498181 (Ohio Ct. App. Dec. 1, 1993)) ("Where no ambiguity exists, the trial court may not construe, clarify or interpret the parties' agreement to mean anything outside of that which it specifically states."). "If a contract is not ambiguous, it must be enforced as written." *Campbell*, 2019 WL 852115, at *3 (citing *CosmetiCredit, LLC v. World Fin. Network Nat'l Bank*, 24 N.E.3d 762, 769 (Ohio Ct. App. 2014)). Accordingly, the Court is not persuaded by SMS's arguments regarding subsequent communications.

      Lastly, SMS asserts that the terms of the Bailey Living Trust confirm that the quarterly payments were intended to terminate upon the deaths of Mr. and Mrs. Bailey. The Bailey Living Trust was created in 2018 after the Assignment was executed, and thus the parol evidence rule does not bar consideration of the Bailey Living Trust. *United States v. Ohio*, 787 F.3d at 354 ("Documents created after a contract's execution, however, are not subject to the parol-evidence rule."). The Bailey Living Trust provides that "[t]he Trustee shall terminate the Trust after the deaths of the Settlors." (Doc. 49-3 at PageID 3465.) SMS also notes the Bailey Living Trust is a "living trust" and only operative during the lifetime of Mr. and Mrs. Bailey, in contrast to a testamentary, family, or inheritance trust. According to SMS, the termination language and nature of the Bailey Living Trust make clear that quarterly payments under the Assignment were intended to cease upon the deaths of Mr. and Mrs. Bailey. Plaintiffs, however, note the Trust also states that "before termination of the Trust, the Trustee shall distribute all of the income of the Trust pro rata to the successor income beneficiaries, payable at least annually." (*Id*. at PageID 3463.) Based on this language, Plaintiffs argue the Bailey Living Trust cannot be

terminated until it receives the remaining quarterly payments due under the Assignment. The Court need not wade through the merits of these arguments. This is a contract-dispute action, not an action for breach of trust or breach of a trustee's fiduciary duties, and whether Plaintiffs have acted in accordance with the terms of the Bailey Living Trust is not currently before the Court. Further, given that the language of the Assignment is clear and unambiguous, SMS cannot create an ambiguity by referencing the terms of the Bailey Living Trust. *See Campbell*, 2019 WL 852115, at *3; *Wiseman*, 2014 WL 1896482, at *2.

The Assignment unambiguously states that quarterly payments shall be made "until the final 40th scheduled payment has been completed." (Doc. 1-1 at PageID 8.) SMS breached this provision by terminating the quarterly payments after completing the 11th payment. Plaintiffs are thus entitled to summary judgment on their breach of contract claim regarding the Assignment. Prior to ceasing quarterly payments, SMS only made 11 of the required 40 quarterly payments, and thus 29 quarterly payments of $27,500 remain outstanding. Further, the Assignment provides that interest shall accrue on any quarterly payments that are past due by more than 15 days "at a rate equal to the lower of 12% per annum and the maximum interest rate permitted by applicable law." (Doc. 1-1 at PageID 8–9.) Thus, Plaintiffs are entitled to damages in the amount of $797,500, in addition to interest on any quarterly payments that are past due by more than 15 days to be calculated at a rate of 12% per annum.

### C. Count II: Breach of the CCA

Next, Plaintiffs claim Hart breached the CCA by failing to make payments due under the Assignment. The CCA provides that "Hart agrees that he will personally and unconditionally guaranty payment due from" a purchase of Mr. Bailey's shares. Plaintiffs therefore contend that SMS's failure to make payments under the Assignment as they came due triggered Hart's

13

obligations under his personal guaranty in the CCA. Hart asserts the guaranty does not extend to the Assignment, as the CCA limits application of the guaranty to a specific set of circumstances.

"Under Ohio law, it is well settled that the interpretation of a guaranty is identical to the principles of regular contract interpretation." *Rosy Blue, NV v. Lane*, 767 F. Supp. 2d 860, 865 (S.D. Ohio 2011) (quoting *New Market Acquisitions Ltd. v. Powerhouse Gym*, 154 F. Supp. 2d 1213, 1219 (N.D. Ohio 2001)). "[A] contract of guaranty is to be construed in favor of the guarantor." *Bank One, N.A. v. PIC Photo Finish, Inc.*, No. 1665, 2006 WL 2876370, at *3 (Ohio Ct. App. Oct. 6, 2006) (citing *Liquidating Midland Bank, Trustee v. Stecker*, 40 Ohio App. 510, 179 N.E. 504, 506 (1930)). Similar to a surety, "[a] guarantor is bound only by the precise words of his contract." *Fairview Realty Investors, Ltd. v. Seaair, Inc.*, No. 81296, 2002 WL 31771263, at *2 (Ohio Ct. App. Dec. 12, 2002) (citations omitted). "The language used is to be understood in its plain and ordinary sense, as read in light of the surrounding circumstances, the situation of the parties, and the object of the guaranty." *Rosy Blue*, 767 F. Supp. 2d at 865 (quoting *Merchants' Nat'l Bank v. Cole*, 83 Ohio St. 50, 93 N.E. 465, 466 (1910)); *see also Fairview Realty*, 2002 WL 31771263, at *2 ("The guarantee must clearly manifest an intent to bind the [guarantor].").

The Court agrees with Hart and finds that he did not personally guarantee the quarterly payments due under the Assignment. Section 10 of the CCA provides, in relevant part:

> [Mr.] Bailey agrees that he will not, during his lifetime, sell, transfer, [or] trade . . . any portion or all of the shares owned by him (the "Common Stock") . . . If [Mr.] Bailey desires to dispose of any or all of his Common Stock during his lifetime he shall give the Company notice of his intent to sell, and the Company or Hart may purchase the Shares subject to the terms of this Agreement. The compensation due to the selling Shareholder shall be determined in accordance with this Section 10 . . . The purchase price for any repurchase in accordance with this Section 10 shall be an amount equal to the book value of the Common Stock at the time of redemption, excluding goodwill. This purchase price may be paid in up to twelve equal month installments, without interest. Hart agrees that he

14

will personally and unconditionally guaranty payment due from such redemption. (Doc. 1-2 at PageID 14–15.)

Hart argues Mr. Bailey's shares were not purchased pursuant to a redemption as contemplated in the CCA. Hart has submitted, under seal, a business evaluation report indicating that the book value of the Common Stock at the time the Assignment was executed was negative, and thus the redemption price pursuant to the CCA would have been $0.00. (Business Evaluation, Doc. 43-10 at PageID 2363–65.) Rather, Mr. Bailey's shares were assigned to SMS in exchange for $1.1 million, to be paid in quarterly installments of $27,500. (Doc. 1-1 at PageID 8.) The Assignment includes no language indicating that the transaction constituted a redemption pursuant to the CCA, that the quarterly payments were calculated in accordance with the CCA, or that Hart agreed to personally guarantee the quarterly payments. Given the plain language of the guaranty contained in the CCA—"Hart agrees that he will personally and unconditionally guarantee payment *due from such redemption*"—the Court concludes that the guaranty in the CCA does not extend to the Assignment, and therefore Hart is not personally liable for payments due under the Assignment.

In light of the plain language of the CCA outlining the circumstances in which Hart agreed to personally guarantee payment for a redemption, *L.I. Development-Ohio, L.L.C. v. 6150 Som Center Road, L.L.C.*, No. 107865, 2019 WL 4131127 (Ohio Ct. App. Aug. 29, 2019), is instructive. There, a tenant entered into a commercial lease, and three of its owners signed in their personal capacity as guarantors. A few years later, the tenant executed an extension to the original lease, and none of the owners executed a separate guaranty with respect to the extension. *Id*. at *1. After the tenant defaulted during the term of the lease extension, the court had to determine whether the guaranty extended to the lease extension. The court held that guaranty

was limited to the original term of the lease as the original lease, guaranty, and lease renewal were ambiguous as to whether the guaranty extended to the lease extension. *Id*. at *5. In so holding, the court noted the renewal did not reference the guaranty, a provision of the lease limited the guaranty to "[t]his Lease" and omitted any reference to renewal, and there was no provision in the lease providing that the guaranty applied to subsequent lease renewals. *Id*. at *4–5. Applying the court's reasoning to the facts at hand, Hart is not personally liable under the Assignment. The personal guaranty in the CCA encompasses a redemption based on a specific valuation methodology, and such a scenario never came to fruition.

Nonetheless, Plaintiffs argue the Assignment was in fact a stock redemption as contemplated by the CCA, but it was structured in a manner to obtain favorable tax benefits. Further, Plaintiffs note that in executing the Assignment, the signatories "jointly represent[ed] that they consider this Agreement to be consistent with all terms and conditions of Company documents which have existed at any time," and therefore contend the Assignment effectively overrode the CCA's provision regarding valuation of the Common Stock for purposes of a redemption. (Doc. 1-1 at PageID 8.) The Court rejects these arguments as the plain language of the guaranty forecloses such conclusions as delineated *supra*. "[A] guarantor's liability . . . is governed by the terms used in the contract." *O'Brien v. Ravenswood Apartments, Ltd.*, 169 Ohio App. 3d 233, 862 N.E. 2d 549, 555 (2006); *see also Cecilian Bank v. Goldsmith*, No. 1:13-cv-00879, 2014 WL 1670086, at *3 (S.D. Ohio Apr. 23, 2014) (citing *O'Brien*, 862 N.E.2d at 555)) ("Where the terms of the guaranty are plain and unambiguous, the court simply enforces the terms and cannot construe a different meaning."). The guaranty only applied to a redemption as specified in the CCA, not to the Assignment executed by Mr. Bailey and SMS.

For these reasons, Hart's personal guaranty in the CCA does not extend to the

Assignment, and therefore Hart is not personally liable for the quarterly payments. Accordingly, Hart is entitled to summary judgment on Count II.

### D. Count III: Breach of Fiduciary Duty

Count III alleges that Hart, as a majority shareholder, owed a fiduciary duty to Mr. Bailey, the minority shareholder, and Hart breached this duty by ceasing quarterly payments under the Assignment. To establish a claim of breach of a fiduciary duty, a plaintiff must prove "[1] the existence of a duty arising out of a fiduciary relationship, [2] failure to observe that duty, and [3] injury resulting proximately therefrom." *Spalla v. Fransen*, 188 Ohio App. 3d 666, 936 N.E.2d 559, 564 (2010) (citing *Culbertson v. Wigley Title Agency*, No. 20659, 2002 WL 219570, at *3 (Ohio Ct. App. Feb. 13, 2002)).

In Ohio, "majority shareholders owe a heightened fiduciary duty to minority shareholders in closely held corporations." *Kirila v. Kirila Contractors., Inc.*, No. 2015-T-0108, 2016 WL 4426409, at *4 (Ohio Ct. App. Aug. 22, 2016) (quoting *Crosby v. Beam*, 83 Ohio App. 3d 501, 615 N.E.2d 294, 299–300 (1992)). Hart contends summary judgment in his favor is warranted on the breach of fiduciary duty claim because it is duplicative of Plaintiffs' breach of the Assignment claim.[6] As to the conduct giving rise to the purported breach of fiduciary duty, Plaintiffs claim that "[b]y using his power to discontinue SMS's payments under the Assignment, Hart breached his heightened fiduciary duty." (Doc. 57 at PageID 3671.) Yet, "a breach of contract . . . by itself does not transform . . . [a] contractual duty into a fiduciary one." *Freimark & Thurston Agency, Inc. v. Nat'l City Bank of Dayton*, 231 F. Supp. 2d 713, 722 (S.D.

---

[6] Hart also argues that no fiduciary duty was owed to Mr. Bailey at the time SMS ceased the quarterly payments in 2019 as Mr. Bailey assigned his shares to SMS on December 31, 2016, at which time he ceased to be a shareholder. (Doc. 1-1 at PageID 8.) However, the Assignment also provides that "[f]ollowing the *full performance* of this Agreement by Company, Assignor will no longer be a shareholder of the Company and will have no rights in the Company." (*Id*. at PageID 9 (emphasis added).) Based on this language, Plaintiffs contend a fiduciary duty continues to exist until the final quarterly payment is completed. Given that the Court concludes the breach of fiduciary duty claim is not independent from the breach of contract claim, it need not resolve these arguments.

17

Ohio 2002); *see also Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 684 N.E.2d. 1261, 1270 (1996) ("Generally, the existence of a contract action excludes the opportunity to present the same case as a tort claim.") (quotations and citation omitted). As the District Court for the Northern District of Ohio recently explained:

> [A] claim of breach of a fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care. To have a cognizable tort claim, the plaintiff must allege a breach of some positive legal duty imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contract obligation. In other words, when a duty is imposed by a contract, the tort claim fails.

*CH Liquidation Assoc. Liquidation Trust v. Genesis Healthcare Sys.*, No. 5:18 CV 752, 2019 WL 13150910, at *6 (N.D. Ohio Mar. 22, 2019) (quotations and citations omitted). "In a case where . . . 'the causes of action in tort and in contract are factually intertwined, a plaintiff must show that the tort claims derive from the breach of duties that are independent of the contract and that would exist by force of law notwithstanding the formation of the contract.'" *Academic Imaging, LLC v. Soterion Corp.*, 352 F. App'x 59, 65 (6th Cir. 2009) (quoting *Cuthbert v. Trucklease Corp.*, No. 03AP-662, 2004 WL 1879023, at *10 (Ohio Ct. App. Aug. 24, 2004)).

Here, Plaintiffs' breach of fiduciary duty claim is predicated upon the termination of quarterly payments under the Assignment, which is also the gravamen of Plaintiffs' breach of the Assignment claim. The obligation to make quarterly payments is not independent of the Assignment, and thus Plaintiffs cannot proceed with their breach of fiduciary duty claim. As such, Hart is entitled to summary judgment in his favor on Count III.

### E. Counts IV and V: Unjust Enrichment and Conversion

Defendants move for summary judgment on both Plaintiffs' unjust enrichment and conversion claims. Yet, in responding to Defendants' Motion, Plaintiffs do not address either claims. Thus, given Plaintiffs' lack of opposition, summary judgment for Defendants on both

claims is appropriate. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

### F. Count VI: Declaratory Judgment

Count VI of the Complaint asserts a claim for declaratory judgment to clarify the rights and obligations of the parties under the Assignment and the CCA. Specifically, Plaintiffs request a declaration that: (1) the Assignment is a valid contract; (2) Defendants are required to make payments of $27,500 per quarter, payable on the first day of each quarter, for a total of 40 quarters, beginning on January 1, 2017, until the 40th payment is made on October 1, 2026; (3) past due, current, and future quarterly payments are to be paid by wire transfer to an account designated by Plaintiffs; (4) Defendants' payment obligations under the Assignment do no cease because of Mr. Bailey or Mrs. Bailey's deaths and will not cease or otherwise terminate until the 40th payment has been completed, which must occur on or before October 1, 2026; (5) interest shall accrue at the rate of 12% per annum on any amounts that are past due by more than 15 days; and (6) Hart is personally liable for all payments under the terms of the CCA.

"While courts have the discretion to decide whether to entertain a declaratory judgment action, they typically 'deny declaratory relief if an alternative remedy is better or more effective.'" *Putman v. Allstate Ins. Co.*, No. 1:21-cv-14, 2021 WL 1580836, at *3 (S.D. Ohio Apr. 22, 2021) (quoting *Grand Trunk Western R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)). Where the "validity and enforceability of . . . [a] contract[] ha[s] already been placed at issue" by a breach of contract claim, a "claim for damages is a better and more effective remedy" and declaratory relief is therefore not appropriate. *Miami Valley Mobile*

*Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 938 (S.D. Ohio 2012). Here, Plaintiffs' claim for declaratory judgment regarding the Assignment has already ripened into a cause of action for breach of contract, and thus, declaratory judgment on these issues is duplicative and unnecessary. *See Putman*, 2021 WL 1580836, at *3 (citing cases). Further, as the Court concluded *supra*, Hart did not personally guarantee the quarterly payments due under the Assignment. Accordingly, Defendants are entitled to summary judgment on Count VI.

### IV. CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Partial Summary Judgment (Doc. 53) is **GRANTED** as to Count I and **DENIED** as to Counts II and VI. Defendants' Motion for Summary Judgment (Doc. 52) is **DENIED** as to Count I and **GRANTED** as to Counts II, III, IV, V, and VI. Plaintiffs are entitled to damages in the amount of $797,500, plus interest on any quarterly payments past due by more than 15 days calculated at a rate of 12% per annum.

**IT IS SO ORDERED**.

S/Susan J. Dlott
Susan J. Dlott
United States District Judge